## NAMET *v.* UNITED STATES.

No. 134. Argued March 18, 1963.—
Decided May 13, 1963.

*John H. FitzGerald* argued the cause and filed a brief for petitioner.

*Stephen J. Pollak* argued the cause for the United States. With him on the brief were *Solicitor General Cox, Assistant Attorney General Miller, Beatrice Rosenberg* and *Theodore George Gilinsky.*

MR. JUSTICE STEWART delivered the opinion of the Court.

The petitioner was convicted by a jury on two counts of violating the federal wagering tax law, §§ 4411 and 4412 of the Internal Revenue Code of 1954, 26 U. S. C. §§ 4411, 4412. His conviction was affirmed by the Court of Appeals for the First Circuit, 301 F. 2d 314. The petitioner contends that his conviction should have been reversed because at his trial the prosecutor was permitted to ask two witnesses incriminating questions concerning their relationship with the petitioner, with the knowledge that the witnesses would invoke their privilege against self-incrimination. We granted certiorari to resolve an asserted conflict with decisions in other circuits. 371 U. S. 858.

The theory of the prosecution's case was that the petitioner had operated a small gambling ring in Chelsea, Massachusetts. His method of operation, according to the Government's theory, was to visit several neighborhood stores at regular times each day for the purpose of collecting betting receipts and paying off winning bets. One of the shops he visited was a variety store owned by Irving and Annette Kahn.

Informations charging violations of the federal wagering tax laws were filed against the petitioner and the Kahns on the same day. All three were represented by the same lawyer, John H. Fitzgerald, and all three pleaded not guilty. On the day of the petitioner's trial, the Kahns changed their pleas to guilty. Because they had previously told government investigators that the petitioner had collected the wagers made in their store and had personally settled accounts with them, the Kahns were subpoenaed to appear at the petitioner's trial.

In his opening statement to the jury, the prosecuting attorney stated that he had reason to believe "a husband

and wife" would testify against the petitioner. Upon the completion of the opening statement, Mr. Fitzgerald approached the bench, and the following colloquy took place:

"MR. FITZGERALD: Your Honor, it is my understanding that the United States Attorney is going to attempt to use the Kahns as witnesses.

"Now, keeping in mind that they are defendants, that they are entitled not to testify in their own case—

"The COURT: They have pleaded guilty.

"MR. FITZGERALD: I know that, your Honor, but still I didn't waive any Constitutional privileges in their behalf.

"The COURT: I think the law is that they have no Constitutional privileges after they have pleaded.

"MR. FITZGERALD: Your Honor, further that they are under investigation by the Internal Revenue Department as far as their income taxes are concerned, and everything else.

"The COURT: Well, I haven't seen them take the stand yet, and if they claim the Fifth, I will rule on it then."

After brief testimony by the first government witness, the United States called Annette Kahn. Mr. Fitzgerald repeated his objection for the record, but made no further arguments.[1] Mrs. Kahn then testified to her name, her address, the ownership of the store, and her acquaintance with the petitioner. She refused to answer whether she and her husband had "some type of business relationship" with the petitioner. An extended colloquy at the

---

[1] "MR. FITZGERALD: Your Honor, may the record show that I object to the use of this witness.

"The COURT: All right, it may be noted."

bench ensued. The court eventually concluded that Mrs. Kahn's plea of guilty to the charge of engaging in the business of accepting wagers deprived her of the right to refuse to testify about her own gambling activity. But the court also ruled that she did not have to testify about any dealings with third persons since she was still, at least theoretically, subject to prosecution for conspiracy, or possibly bribery. Mr. Fitzgerald made no new objections or arguments during this colloquy. To the contrary, he appeared to acquiesce in the questioning of Mrs. Kahn in open court once he had managed to work out a convenient means for advising her when to assert her privilege against self-incrimination.[2]

The questioning of Mrs. Kahn was resumed after a brief recess. The prosecuting attorney began a line of questioning designed to determine whether Mrs. Kahn had known of the gambling tax requirement before the date of her arrest. Mr. Fitzgerald objected, on the ground that the questions were not material. Another conference at the bench was held, in which the prosecuting attorney explained that his purpose was to show that Mrs. Kahn was not in danger of a conspiracy charge. The court sustained Mr. Fitzgerald's objection to the materiality of the questions. The interrogation was then discontinued.

---

[2] "MR. FITZGERALD: Your Honor, may I stand beside her while she testifies, being her counsel?

"The COURT: Well, I would rather have you not stand beside her, because that could impress the jury.

"But ask the questions slowly, and you can take your objection each time.

"MR. FITZGERALD: Your Honor, if I should rise in my chair, may that be taken that she pleads the Fifth Amendment?

"The COURT: Yes. Now, the question pending is what?"

After another recess, the Government resumed the presentation of its case by calling its other witnesses. Their testimony established the following case for the prosecution: The petitioner had been under surveillance by the government agents for one month. They had observed him following the same route twice a day, stopping for a few minutes in each of several variety and cigar stores. During the petitioner's afternoon round, the pockets in his coat became progressively more bulging, inferentially with material gathered in each of the stores. Petitioner returned home with the material. No persons were seen to enter his home between his arrival after the afternoon round and his departure the next morning for the morning round. Expert testimony was introduced showing that the petitioner's activities were consistent with those of a principal in a gambling operation. The afternoon visits during which his pockets became filled, it was testified, indicated a pick-up of the day's betting slips, and the morning visits would fit a pattern of "setting-up" the store owners to pay off the previous day's winning bets. The absence of any apparent contact with other persons after the petitioner's afternoon round would indicate that he himself was acting as banker for the enterprise, and was not passing the money on to another principal. The final ingredient of the Government's case was certain material found during a search of the petitioner's home. This consisted of "slips of number pool wagers," "daily double horse bet slips," and over $1,000 cash in bills of small denominations. The gambling slips were identified by experts as those normally held by the "bookie" rather than by the bettor.

One of the key issues which developed during this part of the case was the question of whether the places regularly visited by the petitioner were, in fact, known gambling establishments. The court sustained objections

by Mr. Fitzgerald to such testimony by government agents, on the ground that the agents could not testify to events observed when the petitioner was not present.

The Government then called Irving Kahn to the stand. No objection was made. Mr. Kahn testified voluntarily that he owned the store in question, and that he was acquainted with the petitioner. After being directed to answer by the court, he testified that he had had dealings with the petitioner. And, when a second claim of privilege was overruled, he also testified that he had accepted wagers in his store. In the questioning which followed, the witness testified that the petitioner did come to his store "a couple of times a week," but denied that the petitioner came every day in the morning and afternoon.

In the course of this interrogation the witness was asked a total of only four questions to which his refusal to answer was sustained.[3] At no time during this questioning did Mr. Fitzgerald object to the questions on behalf of the petitioner, nor did he request any instructions regarding the inferences the jury might draw from these refusals to answer. Indeed, counsel attempted in his closing argument to utilize that part of Irving Kahn's testimony which had contradicted the Government's evidence about the regularity of the petitioner's visits. The closing arguments for the Government contained no references to the Kahns' refusal to answer, and the jury was not told that the Kahns had been arrested or charged together with the petitioner.

-----

[3] "Can you tell us what those dealings [the witness' dealings with the petitioner] were?"

"And were you paid a commission on all the bets you took in your variety store?"

"Who did you accept the bets for that you took in your variety store?"

"Did you ever take bets for the defendant David Namet?"

The court's instructions to the jury contained the following statement with regard to the Kahns' testimony:

> "Nor should any inference be drawn against him because the Kahns refused to testify, unless it would be a logical inference that would appeal to you as having a direct bearing upon the defendant's guilt."

Mr. Fitzgerald made no objection whatever to this part of the instructions.

In turning to the petitioner's argument that his conviction must be set aside because of the circumstances described, we emphasize at the outset what this case does *not* involve. No constitutional issues of any kind are presented. The petitioner does not claim any infringement of his Fifth Amendment privilege against self-incrimination.[4] He does not contend that the Kahns were in any way prejudiced by their assertion of this constitutional privilege.[5] All that this case involves, in short, is a claim of evidentiary trial error.

The petitioner's principal contention is that reversible error was committed in permitting the Government to question the Kahns after it was known that they were going to claim their privilege not to incriminate themselves. It is said that when a witness is asked whether he participated in criminal activity with the defendant, a refusal to answer based on the privilege against self-incrimination tends to imply to the jury that a truthful

---

[4] The petitioner did not take the stand. The court's instruction concerning this fact was as follows:

". . . you must not draw any inference from the fact that the defendant himself did not take the stand. He doesn't have to. He can sit mute and stand or fall upon the Government's case. Or he may take the stand as he wishes. But from the fact that he didn't take it, you should not draw any inference against him."

[5] Cf. *Grunewald* v. *United States*, 353 U. S. 391, 415–424; *Konigsberg* v. *State Bar*, 353 U. S. 252.

answer would be in the affirmative. This inference, the petitioner argues, cannot properly be used as evidence against a criminal defendant. To support this argument, the petitioner relies on dicta in several federal cases and upon the decision in *United States* v. *Maloney,* 262 F. 2d 535, in which the Court of Appeals for the Second Circuit said, "Such refusals [to testify] have been uniformly held not to be a permissible basis for inferring what would have been the answer, although logically they are very persuasive." *Id.,* at 537.[6]

None of the several decisions dealing with this question suggests that reversible error is invariably committed whenever a witness claims his privilege not to answer. Rather, the lower courts have looked to the surrounding circumstances in each case, focusing primarily on two factors, each of which suggests a distinct ground of error. First, some courts have indicated that error may be based upon a concept of prosecutorial misconduct, when the Government makes a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege. This seems to have been one of the principal reasons underlying the finding of reversible error in *United States* v. *Maloney, supra.* In that case, the prosecution admitted knowing that two of its key witnesses could validly invoke the privilege against self-incrimination and intended to do so. The prosecutor nevertheless called and questioned them. The court also found that the Government's closing argument attempted to make use of the adverse inferences from their refusals to testify. See also *United States* v. *Tucker,* 267 F. 2d

---

[6] See *United States* v. *Tucker,* 267 F. 2d 212, 215; *United States* v. *Gernie,* 252 F. 2d 664; *United States* v. *Romero,* 249 F. 2d 371; *United States* v. *Cioffi,* 242 F. 2d 473; *United States* v. *Amadio,* 215 F. 2d 605; *United States* v. *Hiss,* 185 F. 2d 822; *Weinbaum* v. *United States,* 184 F. 2d 330; *United States* v. *5 Cases, etc.,* 179 F. 2d 519. See generally 86 A. L. R. 2d Ann. 1443.

212. A second theory seems to rest upon the conclusion that, in the circumstances of a given case, inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant. This theory seems also to have been present to some extent in the *Maloney* decision, where the court noted that the challenged inferences were the only corroboration for dubious and interested testimony by the Government's chief witness. 262 F. 2d, at 536–537. On the other hand, courts have failed to find reversible error when such episodes were "no more than minor lapses through a long trial." *United States* v. *Hiss,* 185 F. 2d 822, 832 (C. A. 2d Cir.). See also *United States* v. *Amadio,* 215 F. 2d 605, 614 (C. A. 7th Cir.). And even when the objectionable inferences might have been found prejudicial, it has been held that instructions to the jury to disregard them sufficiently cured the error.[7]

The petitioner appears to contend that error was committed under both theories. He stresses the fact that the prosecutor had advance notice of the Kahns' intention to invoke the Fifth Amendment, but questioned them nevertheless. He also argues that the inferences from the Kahns' refusals to testify were crucial to the Government's case, pointing out that the rest of the Government's evidence against the petitioner was entirely circumstantial.

We need not pass upon the correctness of the several lower court decisions upon which the petitioner relies,[8] for we think that even within the basic rationale of those

---

[7] See, *e. g., United States* v. *Gernie,* 252 F. 2d 664 (C. A. 2d Cir.); *Weinbaum* v. *United States,* 184 F. 2d 330 (C. A. 9th Cir.). See also *United States* v. *Maloney, supra,* at 538.

[8] See generally *Grunewald* v. *United States,* 353 U. S. 391, 415–426; *Stewart* v. *United States,* 366 U. S. 1.

cases reversible error was not committed in this case. In the first place, the record does not support any inference of prosecutorial misconduct. It is true, of course, that Mr. Fitzgerald announced that the Kahns would invoke their testimonial privilege if questioned. But certainly the prosecutor need not accept at face value every asserted claim of privilege, no matter how frivolous. In this case, the prosecutor initially did not believe that the Kahns could properly invoke their privilege against self-incrimination, reasoning with some justification that their plea of guilty to the gambling charge would erase any testimonial privileges as to that conduct. His view of the law was supported by substantial authority, cf. *Reina* v. *United States,* 364 U. S. 507, 513, and was in fact upheld by the trial judge. Although it was later ruled that the guilty plea did not render all of the Kahns' conduct immune from further prosecution, thus making testimony as to that conduct privileged, there remained an independent and quite proper reason to call the Kahns as witnesses. Both Mr. and Mrs. Kahn possessed nonprivileged information that could be used to corroborate the Government's case. They could, and did, testify that they knew the petitioner, that he did frequently visit their variety store, and that they themselves had engaged in accepting wagers. The Government had a right to put this evidence before the jury.

Moreover, the bulk of Mrs. Kahn's interrogation, including the only question involving privileged information, occurred before the court ruled that she had a limited testimonial privilege. Although Mr. Kahn was called to the stand somewhat later, there had developed, at that time, still another clearly permissible reason for calling him. The court's rulings during the questioning of the intervening witnesses had prevented the Government from introducing most of the evidence it had planned to use to show that the stores on the petitioner's daily

route were engaged in gambling. Mr. Kahn had pleaded guilty to accepting wagers, and under the District Court's prior ruling his testimony that he had accepted wagers in his store was clearly not privileged. He did so testify, after the court directed him to answer. In the course of eliciting this and other relevant testimony, the prosecutor asked only four questions held to be privileged.

We cannot find that these few lapses, when viewed in the context of the entire trial, amounted to planned or deliberate attempts by the Government to make capital out of witnesses' refusals to testify. We are particularly reluctant to fasten such motives on the Government's conduct when, as here, defense counsel not only failed to object on behalf of the defendant, but in many instances actually acquiesced in the procedure as soon as the rights of the witnesses were secured.

Nor can we find that the few invocations of privilege by the Kahns were of such significance in the trial that they constituted reversible error even in the absence of prosecutorial misconduct. The effect of these questions was minimized by the lengthy nonprivileged testimony which the Kahns gave. They testified about the conduct of gambling operations in their store, as well as their general association with the petitioner. Once these facts were admitted by the Kahns themselves, after government agents had testified to the petitioner's daily visits, a natural and completely permissible inference could be drawn linking the petitioner's visits with the admitted gambling operation. Thus the present case is not one, like *Maloney,* in which a witness' refusal to testify is the only source, or even the chief source, of the inference that the witness engaged in criminal activity with the defendant. In this case the few claims of testimonial privilege were at most cumulative support for an inference already well established by the nonprivileged portion of the witness' testimony.

It should be borne in mind that nothing in this case presents the issue whether the petitioner would have been entitled to instructions or other curative devices [9] if he had asked for them. No such requests were ever made. Far from it, Mr. Fitzgerald impliedly accepted the Kahns' testimony and attempted to use it on behalf of the petitioner in his argument to the jury. The petitioner would have us hold that even in these circumstances the court committed reversible error because it did not, *sua sponte,* take some affirmative action. We see no reason to require such extravagant protection against errors which were not obviously prejudicial and which the petitioner himself appeared to disregard.[10]

There remains for consideration a question concerning the correctness of the court's instruction on the subject of the Kahns' refusals to testify. This issue was nowhere mentioned in the petition for certiorari in this Court, and under our rules it is not before us.[11] Even if it were, we could not find that the instruction amounted to reversible error on the facts of this case. No objection was ever made to this instruction, even though counsel for the petitioner did object to other aspects of the charge. Thus, we are not concerned with whether the instruction was right, but only whether, assuming it was wrong, it was a

---

[9] The Government has suggested that in appropriate circumstances the defendant may be entitled to request a preliminary screening of the witness' testimony, outside the hearing of the jury.

[10] Finding, as we do, that this case involves neither misconduct by the prosecution nor inferences of material importance, we need not pass upon the holding in *United States* v. *Maloney, supra,* that a failure to give proper curative instructions when such elements are present constitutes plain error.

[11] The issue was brought to this Court's attention in the Government's memorandum in reply to the petition.

Rule 23, par. 1 (c) of the Supreme Court Rules provides, "Only the questions set forth in the petition or fairly comprised therein will be considered by the court."

plain error or defect "affecting substantial rights" under Rule 52 (b) of the Federal Rules of Criminal Procedure.[12] What has been said concerning the very limited effect of any inferences arising from the Kahns' refusals to testify makes it clear that this brief passage in the charge could not have affected any substantial rights of the petitioner.

*Affirmed.*

MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS concurs, dissenting.

I believe it was error for the trial court to permit the prosecuting attorney in the presence of the jury to ask questions which he well knew the witnesses would refuse to answer on the ground of self-incrimination. And I cannot conclude that this error was not prejudicial to the defendant. Certainly the prosecutor must have thought the refusals to answer would help the State's case; otherwise, he would not have asked the questions that he knew would not be answered. One need only glance at the questions set out in note 3 of the majority opinion to see that, as people ordinarily reason, the jury would have inferred that the witnesses refused to answer so that they would not have to admit that they had been engaged in violating the gambling laws with the defendant. Indeed,

---

[12] Rule 30 provides, in pertinent part: "No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury."

Rule 52 provides:

"(a) Harmless Error. Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.

"(b) Plain Error. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

a part of the court's charge, to which no exception was taken, left the jury free to infer this defendant's guilt from the refusal of the Kahns to answer the questions.* To my way of thinking, this is an unfair way of getting convictions and should not be condoned by the Court's treating these questions as minor lapses or by its speculation as to how good or bad the motives of the prosecutor were. Nor can I agree that the defendant either disregarded or acquiesced in the trial court's erroneously permitting the jury to be influenced by the witnesses' claim of privilege. Even before the witnesses were put on the stand by the prosecutor, defendant's counsel warned the court and the prosecutor that the privilege would be claimed, and later, when examination of the witnesses had begun, the court acknowledged not only the right to claim the Fifth Amendment's privilege under the circumstances but also the court's intention to sustain the claim if made. The court nevertheless allowed the Government to proceed with its examination, during which the jury heard the witnesses claim, and the court sustain, their privilege in refusing to answer several questions put to them. True, counsel for defendant later tried, as any good lawyer would, to turn this bad situation to his advantage by referring to it. But this took place after the trial court had permitted the poisonous questions to be asked over the original objections. This was not acquiescence in error. I would reverse.

---

* "Nor should any inference be drawn against him [petitioner] because the Kahns refused to testify, unless it would be a logical inference that would appeal to you as having a direct bearing upon the defendant's guilt."