Donnell Latron THOMAS,
Petitioner–Appellant,

v.

Dave GARRAGHTY, Warden
Respondent–Appellee.

No. 00–1574.

United States Court of Appeals,
Sixth Circuit.

Aug. 23, 2001.

Before BATCHELDER and MOORE, Circuit Judges; and BERTELSMAN,[*] District Judge.

## OPINION

KAREN NELSON MOORE, Circuit Judge.

In this case, Petitioner–Appellant Donnell Latron Thomas appeals the district court's denial of his petition for habeas corpus relief pursuant to 28 U.S.C. § 2254. Thomas claims that his Sixth Amendment Confrontation Clause and his Fourteenth Amendment Due Process Clause rights were violated when the prosecutor in his criminal trial called a witness to the stand knowing that the witness would refuse to testify. According to Thomas, the witness's refusal to testify was inherently prejudicial and warrants a new trial. For the following reasons, we AFFIRM the district court's denial of Thomas's habeas petition.

## I. JURISDICTION

We have jurisdiction to hear the district court's denial of Thomas's habeas petition pursuant to 28 U.S.C. § 1291 and 28 U.S.C. § 2253.

## II. BACKGROUND

Thomas was charged with second degree murder, carrying a concealed weapon, and possession of a firearm in the commission of a felony (felony possession) in connection with his role in a gang-related "drive-by" shooting that occurred on February 13, 1993.[1] On that night, Thomas had attended a party in Saginaw, Michigan. As Thomas and several friends, including Curtis Madison, Terry King, Tarkeus Gee, Robert Jamerson, and Marcus Wesby, were leaving the party and were in the process of getting in their cars, a blue pick-up truck drove by and opened fire on the crowd. Witnesses at trial testified that Thomas and Jamerson returned fire at the passing truck. Curtis Madison, who was caught in the crossfire, was shot in the head and killed. The prosecution's theory was that Thomas shot Madison while intending to fire at members of a rival gang in the passing pick-up truck; Thomas was charged with second-degree murder based on this theory of transferred intent.

Testimony at trial revealed that Thomas was firing a 9–mm semiautomatic pistol and Jamerson was firing a .38–caliber revolver. Thomas offered evidence that Wesby had also fired shots. According to testimony for the prosecution, the bullet taken from Madison's head was consistent with one fired from a 9–mm pistol, although such a pistol was never recovered from the scene. Expert testimony for the prosecution also indicated that the trajectory of the bullet that killed Madison came, not from the street where the pick-up truck drove by, but from a position consistent with where Thomas was firing, although it also could have come from a nearby building.

Thomas argued that the prosecution failed to prove he was the killer beyond a reasonable doubt, and that even if he had fired the bullet that killed Madison, it was

[*] The Honorable William O. Bertelsman, United States District Judge for the Eastern District of Kentucky, sitting by designation.

1. The following facts are contained in the Michigan Supreme Court's decision *People v.* *Gearns,* 457 Mich. 170, 577 N.W.2d 422, 426 (Mich.1998). Thomas's case was consolidated with *Gearns* before the Michigan Supreme Court.

not murder. *See Gearns*, 577 N.W.2d at 426. Based on this evidence, Thomas was convicted by a jury of voluntary manslaughter as well as the two firearms charges. The trial court departed upward from the sentencing guidelines' range and imposed a ten-to fifteen-year sentence for the voluntary manslaughter conviction to run concurrently with a sentence for carrying a concealed weapon and consecutive to a two-year sentence for felony firearm possession.

Before trial, the prosecution approached Tarkeus Gee to question him about the testimony he would offer at trial. According to the Michigan Supreme Court, the following occurred:

> The prosecutor and the police went to interview Mr. Gee in jail before trial, and Mr. Gee indicated that he had no intention of testifying. Mr. Gee also said there was nothing anyone could do to make him testify. The prosecutor requested that the court compel him to take the stand. The court asked Mr. Gee why he was refusing—if he was going to assert the Fifth Amendment privilege. The prosecutor agreed to grant immunity. The prosecutor and the court agreed that if Mr. Gee still refused to testify, the prosecutor would have the right to call him. The defense maintained that to call him would be unfairly prejudicial to defendant.
>
> Mr. Gee took the stand and stated that he did not want to testify, but did not give a reason. The trial court asked if he was refusing to testify because of the Fifth Amendment. Mr. Gee responded 'Yeah, I'm refusing on the Fifth Amendment. Is it more simple that way?' The trial court ruled that Mr. Gee had no Fifth Amendment privilege. Defendant's attorney objected that Mr. Gee had not been properly informed of the scope of his Fifth Amendment rights.

> The trial court then informed him that 'the only person who has a legal right not to testify and to invoke the Fifth Amendment is an individual who believes that he or she may implicate themselves, maybe testify against their own penal interests.' Mr. Gee indicated that he just did not want to testify, and the prosecutor's threats to add to his charges and give him a longer sentence did not bother him. He also stated that he had done nothing wrong and, thus, could not implicate himself.

> Defense counsel argued that it was not permissible to place Mr. Gee on the stand in front of the jury to elicit a refusal to testify, even if the privilege asserted was invalid. The court permitted it over objection, stating that the witness' refusal would be placed on the record before the jury.

*Gearns*, 577 N.W.2d at 426–27. At Thomas's trial, the prosecutor called Gee to the stand; his entire colloquy with Gee consisted of the following questioning:

Q: Mr. Gee, would you tell the Court and jury your full name please.

A: (Shaking head).

Q: Mr. Gee, the court reporter can't record a nod of the head.

A: Well, I'm making sure—I want— I'm refusing to say anything until I get a legal representative.

Q: Mr. Gee, we've had a hearing. The Court is ordering you to testify.

A: I'm refusing to say anything.

Q: Are you refusing to testify?

A: I'm refusing to say anything until I get a legal representative.

The Court: All right. Deputy, will you take control of Mr. Gee, and the Court has found Mr. Gee in con-

tempt of court. You may call your next witness.

J.A. at 189.

On appeal, Thomas argued, *inter alia*, that the prosecutor's act of placing Gee on the witness stand, knowing that Gee would refuse to testify, violated Thomas's Sixth and Fourteenth Amendment rights. The Michigan Court of Appeals agreed with Thomas, reversed his conviction in an unpublished opinion, and remanded for a new trial.

The Michigan Supreme Court reversed the Michigan Court of Appeals, concluding that neither Thomas's Sixth Amendment confrontation rights nor his Fourteenth Amendment due process rights had been violated. Addressing Thomas's Sixth Amendment claim, the Michigan Supreme Court first identified three applicable Supreme Court precedents dealing with violations of the Confrontation Clause: *Namet v. United States*, 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963); *Douglas v. Alabama*, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965); and *Frazier v. Cupp*, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969).

While noting that "[a] defendant has the constitutional right to confront witnesses against him, primarily secured by the right to cross-examination," the Michigan Supreme Court determined that Gee's appearance on the witness stand and his limited response to the prosecutor's few questions did not serve to place in front of the jury "substantive evidence, in the form of testimony or its equivalent." *Gearns*, 577 N.W.2d at 429. According to the Michigan Supreme Court, "[i]mplicit in the Supreme Court's Confrontation Clause jurisprudence is that a witness must put forth *some testimony* before the defendant's right of confrontation comes into play." *Id.* at 430. The Michigan Supreme Court then held that "a mere inference is simply insufficient for a Confrontation Clause violation," *id.*, although it stated that to support a Confrontation Clause claim, an inference drawn from a witness's failure to testify must be of a "form not subject to cross-examination." *Id.* (internal quotation marks omitted). Because Gee did not provide "substantive" testimony, the Michigan Supreme Court concluded that Thomas's Confrontation Clause rights were not even implicated by Gee's appearance on the stand, much less violated. *Id.*

As to Thomas's Fourteenth Amendment claim, the Michigan Supreme Court noted that it was "based on a concept of prosecutorial misconduct, where the government makes a 'conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege.'" *Id.* (quoting *Namet*, 373 U.S. at 186, 83 S.Ct. 1151). While noting that "[t]he Supreme Court has not definitively addressed whether prosecutorial misconduct can violate a defendant's constitutional rights in this context," the Michigan Supreme Court concluded that it had not been ruled out. *Id.* at 431. According to the Supreme Court, "the 'touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.'" *Id.* (quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982)). The Michigan Supreme Court then analyzed Thomas's claim similarly to other claims for prosecutorial misconduct, in which the issue is "whether the [prosecutor's] conduct rose to such a level as to deny the defendant a fair trial in violation of due process." *Id.* Comparing the case before it to cases confronted by its sister state supreme courts, the Michigan Supreme Court held that the prosecutor's actions did not deprive Thomas of a fair trial nor did they constitute "a conscious

and flagrant attempt to build a prosecution case from inferences arising from assertions of testimonial privilege." [2] *Id.* at 432. Thus, the court rejected Thomas's second claim of error.

The district court denied the writ of habeas corpus. *Thomas v. Garraghty,* No. 99–CV–72037–DT, 2000 WL 760705, *1 (E.D.Mich. May 5, 2000). The district court concluded that the Michigan Supreme Court's decision was not an objectively unreasonable application of clearly established federal law.

Thomas timely appealed the district court's decision.

## III. ANALYSIS

### A. Standard of Review

We review the district court's denial of the writ of habeas corpus de novo. *Fowler v. Collins,* 253 F.3d 244, 248 (6th Cir.2001). We may not grant a writ of habeas corpus "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). We must also presume that all determinations of factual issues made by the state court are correct unless the applicant can rebut that presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

The Supreme Court has instructed that the phrases "contrary to" and "unreasonable application of" have independent meaning. *Penry v. Johnson,* 531 U.S. 1003, 121 S.Ct. 1910, 1918, 150 L.Ed.2d 9 (2001). In order for a state court to render a decision "contrary to" clearly established Supreme Court precedent, the state court must "appl[y] a rule that contradicts the governing law set forth in [Supreme Court] cases," or "confront[ ] a set of facts that are materially indistinguishable from a decision of" the Supreme Court and nevertheless arrive at a different result. *Williams v. Taylor,* 529 U.S. 362, 405–06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (O'Connor, J., concurring).

A federal habeas court may find that the state court decision resulted in an "unreasonable application of" clearly established Federal law if "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413, 120 S.Ct. 1495. Distinguishing between an incorrect and in unreasonable application of law, the Supreme Court cautioned that the federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411, 120 S.Ct. 1495.

### B. Confrontation Clause

We must determine whether the Michigan Supreme Court unreasonably applied clearly established Supreme Court prece-

---

**2.** The Michigan Supreme Court then held that while the prosecutor committed evidentiary error by calling Gee to testify, *see id.* at 437, the error did not unfairly prejudice Thomas and was harmless. *See id.* at 438. The Michigan Supreme Court recognized that "Gee's silence implicated defendant by permitting the inference that gang members are honor-bound not to turn against one another" and

that "Gee's adherence to the code of silence strongly suggested the defendant's guilt." *Id.* The court then concluded that while the evidence establishing Thomas as the shooter was circumstantial, it was nevertheless "strong" and the prosecution had carried its burden of establishing that it was "highly probable that the tainted evidence did not contribute to the verdict[ ]." *Id.*

dent when it held that Thomas's Confrontation Clause right was not violated because Gee's presence on the stand did not provide any actual "testimony" that escaped cross-examination. Thomas argues that "under the circumstances of this case, Tarkeus Gee's refusal to testify was compelling evidence against Petitioner." Appellant's Br. at 19. Thomas's theory is that it is inconsequential, given the fact that the jury knew Gee and Thomas were members of the same gang, that Gee did not give any substantive testimony on the stand. He asserts that the jury, when evaluating Gee's refusal to testify, would rely on its commonly held perception that gang members swear loyalty to one another and would conclude, based on Gee's mere presence on the stand, that Gee's refusal to testify implied that he had inculpatory evidence of Thomas's participation in the shooting.

In its analysis, the Michigan Supreme Court correctly identified the applicable Supreme Court precedents. In *Namet v. United States*, a decision explicating the standards for evaluating evidentiary error, the Supreme Court established the foundation for future Confrontation Clause claims. In that case, petitioner challenged his conviction claiming that the prosecutor impermissibly asked two witnesses incriminating questions concerning their relationship with him, with the knowledge that the witnesses would invoke their Fifth Amendment privilege. *See Namet*, 373 U.S. at 180, 83 S.Ct. 1151.

Both witnesses, who had been indicted with petitioner and had pleaded guilty, were eventually compelled to testify at trial. Addressing petitioner's claim that the trial court committed error by allowing the government to question the witnesses after their lawyer had advised the trial court that, if called to the stand, each would invoke the Fifth Amendment privilege, the Supreme Court rejected the suggestion that reversible error was "invariably" committed whenever a witness claimed his privilege not to answer a question. *Namet*, 373 U.S. at 186, 83 S.Ct. 1151. The Supreme Court then noted that lower courts considered the surrounding circumstances in each case, particularly two factors that tended to suggest evidentiary error had occurred: first, "error may be based upon a concept of prosecutorial misconduct, when the Government makes a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege," *id.* at 186, 83 S.Ct. 1151; and second, when, "in the circumstances of a given case, inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant." *Id.* at 187, 83 S.Ct. 1151.

After rejecting petitioner's claim that the state prosecutor committed prosecutorial misconduct, the Supreme Court addressed the second "critical weight" factor. According to the Court, the effect of the witnesses' "few invocations of privilege" was minimized by their "lengthy nonprivileged testimony" connecting the petitioner with the crime and corroborating the government's case. *Id.* at 189, 83 S.Ct. 1151. Moreover, the witnesses' refusal to testify was not the "only source, or even the chief source, of the inference that the witness[es] engaged in criminal activity with the defendant." *Id.* In rejecting the petitioner's claim, the Court reasoned that "the few claims of testimonial privilege were at most cumulative support for an inference already well established by the nonprivileged portion of the witness[es'] testimony." *Id.*

In *Douglas v. Alabama*, the Supreme Court relied upon the second theory articulated in *Namet*—the "critical weight" the-

ory—to find that the defendant's constitutional right to confront witnesses at trial had been violated. In that petitioner's trial for assault with intent to murder, the prosecution called to the stand a witness who had been indicted with defendant, tried separately, and found guilty. *Douglas*, 380 U.S. at 416, 85 S.Ct. 1074. The witness, who planned to appeal his conviction, asserted his Fifth Amendment right not to incriminate himself. The trial court ruled that the witness could not rely on his Fifth Amendment privilege and allowed the state to cross-examine him as a hostile witness. *See id.* The state prosecutor proceeded to read into evidence, under the "guise of cross-examination," a confession purportedly signed by the witness. *Id.* The witness asserted his privilege at every opportunity, but the prosecutor continued until he had read the entire confession to the jury.

The petitioner challenged the state prosecutor's practice as violative of his Sixth Amendment right to confrontation. After affirming that "a primary interest secured by [the Confrontation Clause of the Sixth Amendment] is the right of cross-examination," *id.* at 418, 85 S.Ct. 1074, the Supreme Court held that petitioner's "inability to cross-examine [the witness] as to the alleged confession plainly denied him the right of cross-examination secured by the Confrontation Clause." *Id.* at 419, 85 S.Ct. 1074. The Supreme Court noted that while the prosecutor's reading of the confession was "not technically testimony," it "may well have been the equivalent in the jury's mind" and that the witness's invocation of the Fifth Amendment privilege may have had the effect of creating the inference both that the statements in the confession were made and that they were true. *Id.* Because the witness refused to acknowledge the confession as his, the Court noted that the substance of that confession and the inferences drawn therefrom were effectively presented to the jury in a form not subject to confrontation.

After concluding that the confession was the only direct evidence connecting petitioner with the crime and establishing his mental state, the Supreme Court held that the prejudice in the denial of the right of cross-examination was not "a mere minor lapse." *Id.* at 420, 85 S.Ct. 1074. Instead, according to the Court

> [t]he alleged statements clearly bore on a fundamental part of the State's case against petitioner. The circumstances are therefore such that 'inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant.'

*Id.* at 420, 85 S.Ct. 1074 (quoting *Namet*, 373 U.S. at 187, 83 S.Ct. 1151).

Finally, in *Frazier v. Cupp*, the Supreme Court rejected the petitioner's claim of error that the prosecutor violated his Confrontation Clause rights by referring to a witness's testimony in his opening statement after having been informed by defense counsel that the witness would refuse to testify. *Frazier*, 394 U.S. at 733, 89 S.Ct. 1420. The witness in question was petitioner's cousin, who had been indicted with defendant for murder and had pleaded guilty. In his opening statement, the prosecutor referred to testimony that he expected the cousin to give; the reference to the cousin was not lengthy, nor was the cousin's testimony touted as critical to the prosecution's case. *See id.* at 733–34, 89 S.Ct. 1420. In the course of the trial, the prosecutor called the cousin to the stand. The witness asserted his Fifth Amendment privilege not to incriminate himself, and he was dismissed. His appearance lasted for approximately two to three minutes. *See id.* at 734, 89 S.Ct.

1420. At the close of the evidence, the judge cautioned the jurors not to credit any statements made by counsel concerning the facts of the case as evidence. *See id.* at 734, 89 S.Ct. 1420.

On appeal, the petitioner argued that, similar to *Douglas,* the prosecutor's actions served to place the cousin's testimony before the jury in a way that "may well have been the equivalent in the jury's mind of testimony." *Id.* (quoting *Douglas,* 380 U.S. at 419, 85 S.Ct. 1074). According to the petitioner, the statement "added substantial, perhaps even critical, weight to the Government's case in a form not subject to cross-examination." *Id.*

The Supreme Court's analysis focused on the impact of the prosecutor's opening statement on the jury and the curative effect of the trial court's instruction to the jury. Distinguishing the case from *Douglas,* the Supreme Court noted that the cousin was only on the stand for a short period of time and only a paraphrase of his testimony was placed before the jury during the prosecutor's opening statement. The Court noted that this procedure "was much less damaging than was the case in *Douglas,*" and that, unlike in *Douglas,* the witness's statement was not a "vitally important part of the prosecution's case." *Id.* at 735, 89 S.Ct. 1420. Therefore, according to the Court, the trial court's limiting instructions sufficiently protected the petitioner's constitutional right to confrontation.

In the instant case, the Michigan Supreme Court distinguished *Namet* and *Douglas* by concluding that, unlike in those cases, "[n]o statements or other evidence was presented to the jury that was the 'equivalent ... of testimony'". *Gearns,* 577 N.W.2d at 429. Instead, according to the Michigan Supreme Court, the case was most like *Frazier,* in which "[t]he Supreme Court found no constitu-tional error in circumstances similar to the present circumstances, even with the additional aggravating factor of putting proposed substantive testimony before the jury in an opening statement." *Id.*

We believe that the common thread of the Supreme Court's case law on this subject is that, under certain circumstances, a witness's invocation of the Fifth Amendment privilege before the jury creates the unfavorable inference that the witness and the defendant engaged in criminal conduct together, or that the witness has evidence that inculpates the defendant. The Michigan Supreme Court, in contrast, distinguished the Supreme Court's precedents by focusing on whether testimony, as in *Namet,* or the "equivalent" of testimony, as in *Douglas* and *Frazier,* was placed in front of the jury. We are not convinced that this is a sound principle for distinguishing the Supreme Court's cases from the instant one.

In *Namet,* the Supreme Court noted the converse of the principle relied upon by the Michigan Supreme Court: it stated that lower courts had not *invariably* found reversible error whenever a witness in the presence of the jury claimed his privilege not to testify. The Supreme Court did not hold that a witness's in-court refusal to testify could *never* create reversible error, which is the import of the Michigan Supreme Court's decision. *Cf. United States v. Clark,* 988 F.2d 1459, 1463–64 (6th Cir.1993) (noting that "[w]hile reversible error does not exist each time a witness asserts her privilege to refuse to answer a question, certain circumstances in a particular case may suggest an error") (citing *Namet,* 373 U.S. at 186, 83 S.Ct. 1151). The *Namet* Court eschewed a bright-line rule and, instead, emphasized the importance of examining the circumstances surrounding each witness's refusal to testify. Moreover, the Court's analysis,

which was constitutionalized in *Douglas,* presupposes that the refusal to testify may, in and of itself, add critical weight to the prosecution's case in a form not subject to cross-examination. Therefore, the Michigan Supreme Court's conclusion that "[a] mere inference is simply insufficient for a Confrontation Clause violation" is unfounded.

To be sure, the Supreme Court in *Douglas* did note that the prosecutor's act of reading the confession to the jury could have been the "equivalent" of testimony in the mind of the jury. The Court did not, however, hold that the equivalent of testimony must always be words spoken either by the defendant or, as in *Douglas,* by the prosecutor. The Court merely held that a prosecutor's words may be attributed to the defendant for purposes of a Confrontation Clause claim. Nothing in *Douglas* excludes the possibility that the witness's mere presence on the stand could create an inference unfavorable to the defendant which would add critical weight to the prosecution's case in a form not subject to effective confrontation.[3]

We believe that, under certain circumstances, the prosecutor's act of forcing a witness to claim the Fifth Amendment privilege could create an inference unfavorable to the defendant, particularly when the witness is someone whom the jury would associate with the defendant. If, for example, in a case involving gang members, the prosecutor intentionally called witness after witness—all of whom were in the same gang as the defendant—with the knowledge that these witnesses would re-

fuse to testify, and for the purpose of placing the defendant's silent gang brethren before the jury, this practice might well violate the defendant's Confrontation Clause right to cross-examination (as well as his due process rights) because of the negative inference created in the mind of the jury. *Cf. Harmon v. McVicar,* 95 F.3d 620, 624 (7th Cir.1996) (noting that "reversible error occurs only where the government intentionally forces the witness to invoke the privilege against self-incrimination with the result that an inference unfavorable to the accused is planted in the minds of the jurors"); *United States v. Coveney,* 995 F.2d 578, 585 (5th Cir.1993) (recognizing that "forced invocation of a testimonial privilege might in some cases, so prejudice the defendant as to warrant reversal"). In such a situation, the gang members' collective refusal to testify would create the reasonable inference that the witnesses participated in criminal conduct with the defendant and would, therefore, add critical weight to the prosecution's case in a form not subject to cross-examination. *See United States v. Vandetti,* 623 F.2d 1144, 1149 (6th Cir.1980) (stating that, when trial court determines whether prosecutor may call witnesses who he knows will invoke the Fifth Amendment at defendant's retrial, it should consider that the cumulative effect of six individuals taking the Fifth Amendment, all of whom are associated with the defendant, creates the possibility for unfair prejudice).

Of course, nothing of the sort happened in this case: the questions posed to Gee contained no substance and, more impor-

---

**3.** Indeed, the Michigan Supreme Court's opinion reflects an extremely narrow understanding of the concept of an "inference:" on that court's reading, only words can create an inference. Of course, however, inferences can arise from a witness's silence; the Supreme Court had in mind these very inferences when it referred in *Namet* to lower

court decisions which had found that "inferences from a witness's refusal to answer [could] add[] critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudice[] the defendant." *Namet,* 373 U.S. at 187, 83 S.Ct. 1151.

tant for purposes of analyzing whether any improper inference was created by Gee's presence on the stand, two of the other witnesses who testified at trial were members of Thomas's gang. Although one of the witnesses, Jamerson, testified that he had been offered a plea bargain in exchange for his testimony against Thomas, another witness, Terry King, testified for the prosecution without any plea. King's testimony explicitly placed a 9–mm semiautomatic weapon in Thomas's hand during the drive-by shooting. King also testified that the bullets fired at Madison, the deceased, could not have come from the passing truck. Because members of Thomas's gang testified "against" him, the inference that all gang members are loyal to one another and will protect one another had been eroded by the time Gee took the stand. The facts of this case thus reveal that Gee's testimony did not create an inference that added critical weight to the prosecution's case in a form not subject to cross-examination.

In any event, the fact that the Michigan Supreme Court's holding is "overbroad" is not reason to grant this petitioner's habeas petition. We cannot say that the Michigan Supreme Court's more limited holding—that Gee's refusal to testify did not violate Thomas's Sixth Amendment right to cross-examination—is an unreasonable application of Supreme Court precedent. As the Supreme Court indicated in *Namet*, sometimes courts do not find reversible error when the witnesses' invocations of the privilege were "no more than minor lapses through a long trial." *Namet*, 373 U.S. at 187, 83 S.Ct. 1151. Such was the case in Thomas's trial.

Gee was only one of many witnesses whom the government put on at trial; his appearance on the stand was brief; the prosecutor asked him questions without substance; and the government made no more mention of him either during its case-in-chief or during closing argument. The government's case certainly did not hinge on Gee's appearance at trial: his "refusal to testify [wa]s not the only source, or even the chief source, of" an inference unfavorable to the defendant. *Id.* at 189, 83 S.Ct. 1151. Any inference arising from Gee's refusal to testify was outweighed by the reasonable inferences created by numerous other witnesses' testimony that Thomas had committed a crime. For example, two witnesses testified that Thomas was shooting a 9–mm pistol on the night in question, the same weapon that killed Madison. J.A. at 175 (King's Test.), J.A. at 181 (Williams's Test.). Expert testimony offered at trial also established the inference that the fatal shot to Madison could have been fired from where Thomas was positioned. J.A. at 204.

The Michigan Supreme Court did not err in concluding that this case is most similar to *Frazier* and that the facts in this case "are far less close to constitutional error than the facts in *Frazier*" where the Supreme Court found no Confrontation Clause violation. *Gearns*, 577 N.W.2d at 429. In *Frazier*, the prosecutor actually provided the jury with a summary of what the witness would say during trial in the prosecutor's opening statement. In the instant case, the prosecutor only told the jury that Gee would testify, not the substance of his proposed testimony.

Thomas tries to distinguish *Frazier* from the instant case by arguing that *Frazier* was about limiting instructions to the jury. It is true that the Supreme Court concluded that the limiting instructions were sufficient in that case to eliminate any error the prosecutor may have committed and also that no such instructions were given in the instant case. This difference does not necessarily render *Frazi-*

*er* inapposite. The Supreme Court's cases have made clear that cautionary jury instructions are but one factor to consider when evaluating the circumstances in which a witness refuses to testify; they are not necessarily the dispositive factor. After having considered the facts of this case and the circumstances in which Gee refused to testify, we do not believe that the Michigan Supreme Court erred by relying on the manifest similarities between the two cases and rejecting Thomas's claim of error.

## C. Prosecutorial Misconduct

Thomas's second claim of error is related to his first: he claims that the prosecutor violated his Fourteenth Amendment due process rights because he deliberately called a witness to the stand who he knew would refuse to testify. In *Namet,* the Supreme Court noted that some lower courts had found that evidentiary error, based upon a concept of prosecutorial misconduct, can occur when the prosecutor makes "a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege." *Namet,* 373 U.S. at 186, 83 S.Ct. 1151. According to Thomas, the prosecutor in this case committed such an error.

The Michigan Supreme Court noted the analysis for prosecutorial misconduct articulated in *Namet* and held that, while the Supreme Court has never performed a constitutional analysis with this test, the "touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Gearns,* 577 N.W.2d at 431 (quoting *Smith v. Phillips,* 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982)). We conclude, as did the district court, that the Michigan Supreme Court did not unreasonably apply Supreme Court precedent to the facts of

this case when it held that "merely calling a witness to the stand, even knowing that he will assert Fifth Amendment rights, does not rise to the level of *constitutional* violation." *Id.* at 432.

Although it is true that the prosecutor in this case knew that Gee would refuse to testify, the prosecutor believed that he was entitled to put Gee on the stand to preserve his own credibility with the jury. The prosecutor also believed that Gee did not have a valid privilege, and that this fact was dispositive of the question whether Gee could properly be put on the stand. While the prosecutor's understanding of Michigan law was, according to the Michigan Supreme Court, incorrect, it is also true that the prosecutor did not attempt to ask substantive questions of Gee in order to place the equivalent of Gee's testimony before the jury, nor did he refer to Gee's testimony in his closing argument. When the prosecutor's actions are placed in the context of the entire trial, it is clear that he did not engage in a "planned or deliberate attempt[ ] by the [state] to make capital out of [the] witness['s] refusal[ ] to testify." *Namet,* 373 U.S. at 189, 83 S.Ct. 1151. The Michigan Supreme Court did not unreasonably apply Supreme Court precedent when it concluded that, despite any possible bad faith by the prosecutor, Thomas received a fair trial.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.

ALICE M. BATCHELDER, Circuit Judge, concurring in the result only.

I respectfully concur in the result reached by the majority. The Michigan Court's decision to deny the writ was not "contrary to, or involv[e] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court

of the United States." 28 U.S.C. § 2254(d)(1).

However, I think the majority opinion unnecessarily digresses into a hypothetical discussion of how the outcome might be different given a different set of facts. The only question presented to this court is whether the Michigan Supreme Court applied Supreme Court precedent unreasonably. Having found that they did not, there is no need to speculate in dicta about the reasonableness of what the Michigan Court might have done if presented with another set of facts.