[Cite as *State v. Anderson*, 2013-Ohio-869.]

IN THE COURT OF APPEALS

ELEVENTH APPELLATE DISTRICT

ASHTABULA COUNTY, OHIO


STATE OF OHIO,                          :          **O P I N I O N**

        Plaintiff-Appellee,          :

    - vs -                                   :          **CASE NO. 2012-A-0031**

CHRISTINA M. ANDERSON,          :

        Defendant-Appellant.          :


Criminal Appeal from the Ashtabula County Court of Common Pleas, Case No. 2011 CR 523.

Judgment: Affirmed.


*Thomas L. Sartini*, Ashtabula County Prosecutor, and *Shelley M. Pratt*, Assistant Prosecutor, Ashtabula County Courthouse, 25 West Jefferson Street, Jefferson, OH 44047 (For Plaintiff-Appellee).

*Ariana E. Tarighati*, Law Offices of Ariana E. Tarighati, L.P.A., 34 South Chestnut Street, #100, Jefferson, OH 44047 (For Defendant-Appellant).


DIANE V. GRENDELL, J.

{¶1} Defendant-appellant, Christina Anderson, appeals her conviction for Burglary, following a jury trial in the Ashtabula County Court of Common Pleas. Anderson was sentenced to three years incarceration in prison. The issues before this court are: whether a court errs by failing to declare a mistrial where the prosecution presents the defendant's boyfriend, dressed in jail clothes, as a witness despite the assertion of his Fifth Amendment right not to testify; and whether a conviction for

Burglary is against the weight of the evidence and/or supported by insufficient evidence where the only direct evidence is that the defendant was in another's house. For the following reasons, we affirm the decision of the court below.

{¶2} On January 19, 2012, Anderson was indicted by the Ashtabula County Grand Jury on one count of Burglary, a felony of the second degree in violation of R.C. 2911.12(A)(2).

{¶3} On January 27, 2012, Anderson was arraigned and entered a plea of not guilty.

{¶4} On April 25, 2012, Anderson was tried before a jury. At trial, the following witnesses testified:

{¶5} Joseph Arcaro, a resident of 2520 Arlington Drive, Ashtabula, Ohio, testified that, on the morning of November 30, 2011, he left home to take his girlfriend's child to school. Arcaro left at 7:20 a.m., and returned about twenty or twenty-five minutes later.

{¶6} Upon his return, Arcaro noticed a red Saturn in his driveway, backed up to his garage. Someone was in the passenger's seat and appeared to be sleeping; and the windows were "a little bit fogged up."

{¶7} Arcaro entered his home through a breezeway door leading into the kitchen; the door to the kitchen was "cracked open" and "there was steam on the windows of the breezeway." Arcaro passed through the kitchen to the dining room, where he "heard a noise coming back from my bedroom area." Arcaro began screaming that he was "going to call the police." After three or four yells, "a young lady," later identified as Anderson, emerged from the hallway connecting the dining room to

2

the bedrooms. Arcaro began yelling at her "to get out of my house." Anderson told Arcaro to "calm down, sir," and that "she was looking for Robert."

{¶8} Arcaro continued screaming at Anderson, while he followed her out of the house back through the breezeway. It took about a minute to a minute and a half for Anderson to leave Arcaro's residence. Anderson entered the red Saturn and drove away. Arcaro noted the vehicle's license plate number and the Ashtabula City Police Department was notified.

{¶9} After the police arrived, Arcaro noticed that the television in his bedroom, a 42-inch flat screen, was turned about six or seven inches. Arcaro also noticed that the electric cord and the cable were disconnected from the wall sockets, and that the dust on the television had been disturbed.

{¶10} Lieutenant Rodney Blaney testified that he was able to trace the red (maroon) Saturn to a Terry Pfendler, who had loaned it to her son, Donald Wimer, who was currently living with his girlfriend, Christina Anderson, at property near 916 East 17th Street, in Ashtabula.

{¶11} Lieutenant Blaney arrived at the East 17th Street property at about 9:45 a.m., on the morning of the incident. The door was answered by Heather Knam, identified as the passenger in the Saturn. Lieutenant Blaney spoke with Wimer, who informed him that Anderson had been driving the vehicle that morning, and that she was presently in bed. When Anderson refused to come out of the bedroom, Lieutenant Blaney entered the bedroom. He read Anderson the Miranda warnings, at which point she "immediately blurted out * * * that she was in the house but she didn't do anything

3

wrong," and that "she was looking for someone named Robert." Lieutenant Blaney advised Anderson that she was under arrest, and, thereafter, she was compliant.

{¶12} Lieutenant Blaney described all persons in the residence as "disheveled," i.e., "their overall appearance looked tired and under the influence [of narcotics] and [their] clothes were just messy."

{¶13} Patrolman Adam Simons testified that he visited Arcaro's home and confirmed that the television set had been moved, the cord and cable were unplugged, and the dust disturbed. Patrolman Simons was also present when Anderson was arrested. He asked Anderson to provide Robert's last name, which she refused to do.

{¶14} Christina Anderson testified in her own defense. She testified that, on the morning of November 30, 2011, she and Heather Knam had driven to Circle K and then went to pick up a friend of Knam's named Brandon. Anderson denied that she had ever claimed to be looking for a Robert. They stopped at one house, where a lady directed them "across the street and a couple doors down, and said she thinks that the guy lives there." Following these directions, they pulled "right in" Arcaro's driveway, facing the garage.

{¶15} Anderson testified that Knam remained in the vehicle because she was tired on account of medication she was taking. Anderson testified that the breezeway door was already open. She went into the residence, but no further than the dining room. Anderson denied entering the bedrooms and unplugging the television. In other respects, her testimony of events within the residence corroborated Arcaro's testimony.

{¶16} After leaving Arcaro's residence, Anderson returned to the East 17th Street residence and took a nap. After the police arrived, she tried to explain that they

4

were looking for someone named Brandon and that his last name began with a W, "like Welsh or Walsh."

{¶17} The jury returned a verdict of guilty on the charge of Burglary.

{¶18} On June 28, 2012, a sentencing hearing was held. The trial court sentenced Anderson to three years incarceration in prison.

{¶19} On July 24, 2012, Anderson filed a Notice of Appeal. On appeal, Anderson raises the following assignments of error:

{¶20} "[1.] The trial court's failure to grant a mistrial after a witness asserts his Fifth Amendment right not to testify was an abuse of discretion and deprived the defendant-appellant of a fair trial and the right to confrontation in violation of her Sixth and Fourteenth Amendment Rights."

{¶21} "[2.] The trial court erred to the prejudice of the defendant-appellant when it returned a verdict of guilty against the manifest weight of the evidence in violation of Article IV of the Ohio Constitution."

{¶22} In the first assignment of error, Anderson argues that the trial court erred and abused its discretion by not granting a mistrial after the prosecution called her boyfriend, Donald Wimer, to testify. Wimer was brought into court wearing jail clothes, but refused to testify, ostensibly relying on his Fifth Amendment right against self-incrimination. Anderson contends this episode would "lead the jury to infer Mr. Wimer knew something which could only hurt Ms. Anderson had he testified."

{¶23} "In a criminal case, where a claim of a witness that he can not be compelled to testify as a witness because of the privilege of immunity from self-incrimination is properly established, it is error prejudicial to the defendant for the court

5

to permit counsel for the state, by continued questioning of the witness, which questions go unanswered, to get before the jury innuendoes and inferences of facts, conditions and circumstances which the state could not get before the jury by direct testimony of the witness." *State v. Dinsio*, 176 Ohio St. 460, 200 N.E.2d 467 (1964), syllabus.

**{¶24}** Nonetheless, "[a] witness, even though he has previously indicated that he will refuse to testify on the ground that to do so would incriminate him, may be called as a witness." *Id.* at 466. "[A]lthough a witness cannot be compelled to give incriminating testimony, he must if properly summoned appear and be sworn[;] * * * [t]he possibility that a witness may claim the privilege does not prohibit the prosecutor from asking questions." (Citation omitted.) *Id.* "*Dinsio* does not preclude questioning which may elicit the assertion of the Fifth Amendment privilege, but merely *repeated* questioning where reassertion of the privilege is assured." (Emphasis sic.) *Columbus v. Cooper*, 49 Ohio St.3d 42, 45, 550 N.E.2d 937 (1990).

**{¶25}** Anderson relies on federal precedents for the proposition that reversible error may occur where, "based upon a concept of prosecutorial misconduct, * * * the Government makes a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege," or "inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant." *Namet v. United States*, 373 U.S. 179, 186-187, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963).

**{¶26}** Neither of the circumstances described in *Namet* are similar to the facts before this court.

{¶27} In the present case, the prosecution duly summoned Donald Wimer to testify as a witness at trial. In the prosecution's opening statement, the substance of Wimer's anticipated testimony was presented as follows:

> {¶28} The mother indicated that that car was loaned to her son, Donald Wimer, who we will have testify. And the son indicated that his girlfriend had gone to the store. His girlfriend being the defendant, Christina Anderson.

{¶29} Following Arcaro's testimony at trial, Wimer was sworn and called to the witness stand. The following colloquy occurred:

> {¶30} The Court: And, Ms. Thomas [the prosecutor], you have subpoenaed Mr. Wimer as a witness in this case?
>
> {¶31} Ms. Thomas: I did, Your Honor.
>
> {¶32} The Court: Mr. Wimer, I was just informed by Bailiff, Diana Perry, you do not wish to testify.
>
> {¶33} The Witness: Yes, sir.
>
> {¶34} The Court: And why do you -- why do you wish not to testify?
>
> {¶35} The Witness: I just don't want to.
>
> {¶36} The Court: You just don't want to?
>
> {¶37} The Witness: It's my girlfriend, I mean --
>
> {¶38} The Court: Well, you have been subpoenaed as a witness.
>
> {¶39} The Witness: If I have to, I will.
>
> {¶40} The Court: All right, go ahead.

7

{¶41} Ms. Thomas: Your Honor, I would like to give him Miranda, if I could, just in case he says something incriminating. Well, my officer is more familiar with Miranda, if I could have him Mirandize him.

{¶42} The Court: All right. You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him present with you while you are being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish. You can decide at any time to exercise these rights and not answer any question or make any statement. Do you understand each of these rights that I have explained to you?

{¶43} The Witness: Yes, sir.

{¶44} The Court: And having these rights in mind, do you wish to testify in this matter?

{¶45} The Witness: No, sir.

{¶46} The Court: All right. That ends that. * * * Do not form any conclusions one way or the other in this case concerning the decision of this witness to exercise his Miranda rights.

{¶47} Wimer's appearance and assertion of his right to remain silent did not create any sort of improper or prejudicial inferences regarding Anderson's guilt. Wimer was not involved in the incident at Arcaro's residence beyond lending Anderson his

8

mother's Saturn. The prosecution did not suggest that Wimer had any knowledge of Anderson's intentions that morning, except for going "to the store." The officers involved testified that they did not question Wimer regarding Anderson's activity at Arcaro's residence. Thus, Wimer could not have contributed anything substantive regarding the Burglary charge against Anderson, and there was no suggestion or indication that Wimer knew anything about the incident except for what Anderson might have told him.

{¶48} In contrast to the situations in *Dinsio/Namet*, the prosecution did not create improper inferences or innuendo by repeated questioning of Wimer or otherwise act in bad faith. Wimer's assertion of his desire to remain silent promptly ended the matter.

{¶49} The only possible prejudice from Wimer's appearance was that, due to the jail clothing he wore, the jury could infer that Anderson's boyfriend had been involved in criminal activity. There is no reason to suppose, however, that the jury would allow this inference to influence its deliberations about Anderson's guilt in the present, unrelated matter, contrary to its oath and the trial court's curative instruction. *Namet*, 373 U.S. at 187, 83 S.Ct. 1151, 10 L.Ed.2d 278 ("even when the objectionable inferences might have been found prejudicial, it has been held that instructions to the jury to disregard them sufficiently cured the error").

{¶50} The first assignment of error is without merit.

{¶51} In the second assignment of error, Anderson argues her conviction is against the manifest weight of the evidence.

9

**{¶52}** "To reverse a judgment of a trial court on the weight of the evidence [under Section 3(B)(3), Article IV of the Ohio Constitution], when the judgment results from a trial by jury, a unanimous concurrence of all three judges on the court of appeals panel reviewing the case is required." *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997), paragraph four of the syllabus. "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief*.'" (Emphasis sic.) *Id.* at 387, quoting Black's Law Dictionary (6 Ed.1990) 1594.

**{¶53}** An appellate court considering whether a verdict is against the manifest weight of the evidence must consider all the evidence in the record, the reasonable inferences, the credibility of the witnesses, and whether, "in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

**{¶54}** In order to convict Anderson of Burglary, the State had to prove, beyond a reasonable doubt, that she "trespass[ed] in an occupied structure * * * with purpose to commit in the habitation any criminal offense," in the present case, Theft. R.C. 2911.12(A)(2)

**{¶55}** Anderson contends that the greater amount of credible evidence favors her acquittal. Anderson notes that Arcaro was the only "scene" witness presented; Arcaro was very upset upon encountering Anderson in his home; Anderson adamantly denied the intent to steal anything from Arcaro's home; and no fingerprinting was done to confirm that she was in his bedroom.

**{¶56}** In the present case, Anderson's guilt turned wholly on whether the jury chose to credit Arcaro's testimony that Anderson was in his bedroom and had disconnected/moved his television. There was nothing inherently improbable or incredible about Arcaro's testimony. Patrolman Simons corroborated Arcaro's testimony that the television had been moved. Anderson's testimony regarding her activities that morning, i.e., randomly searching for Knam's friend, Robert/Brandon, at residences along Arlington Drive where Robert/Brandon was purportedly staying with another friend, was unconvincing.

**{¶57}** The second assignment of error is without merit.

**{¶58}** For the foregoing reasons, Anderson's conviction for Burglary in the Ashtabula County Court of Common Pleas is affirmed. Costs to be taxed against the appellant.


CYNTHIA WESTCOTT RICE, J.,

COLLEEN MARY O'TOOLE, J.,

concur.