# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Nov 20 2019, 5:44 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Brent R. Dechert
Kokomo, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Jesse R. Drum
Supervising Deputy
Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Emmanuel Arrington,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff,* | November 20, 2019<br><br>Court of Appeals Case No.<br>19A-CR-94<br><br>Appeal from the Howard Superior Court<br><br>The Honorable Hans Pate, Judge<br><br>Trial Court Cause No.<br>34D04-1602-F1-31 |

**Robb, Judge.**

# Case Summary and Issues

[1]     Following a jury trial, Emmanuel Arrington was convicted of attempted murder, a Level 1 felony, and unlawful possession of a firearm by a serious violent felon, a Level 4 felony. The trial court sentenced Arrington to forty years for his attempted murder conviction and twelve years for his unlawful possession conviction, to be served concurrently. Arrington appeals his convictions and sentence and raises four issues for our review: (1) whether Arrington knowingly, intelligently, and voluntarily waived his Sixth Amendment right to counsel; (2) whether the trial court committed fundamental error when it did not remove the jury following the refusal of a State's witness to testify; (3) whether the State presented sufficient evidence to support Arrington's convictions; and (4) whether the trial court abused its discretion in sentencing Arrington. Concluding Arrington knowingly, intelligently, and voluntarily waived his right to counsel, the State presented sufficient evidence to support Arrington's convictions, and the trial court did not commit fundamental error or abuse its discretion in sentencing Arrington, we affirm.

# Facts and Procedural History

[2]     Steven Landrum, Jeremy Wilson, and Arrington have known each other for many years. Early on the morning of February 2, 2016, all three men were at Big Daddy's Show Club in Kokomo, Indiana. At some point, Wilson and Landrum got into an argument and began to physically fight. Arrington

jumped in and hit Landrum in the back of his head. Security broke up the fight and removed Arrington and Wilson from the club.

[3] After the fight, Landrum also left the club and went to Shanika Anderson's house located on East Mulberry Street. At the house, Landrum called Wilson, accused him of trying to have sex with Landrum's wife, and stated that "if [Arrington] wanted to fight me he could fight me one on one." Transcript, Volume II at 222. At the time of the call, Wilson and Arrington were together and Landrum could hear Arrington calling him names in the background. Wilson asked Landrum where he was, and Landrum stated he was "over on Mulberry" Street. Id. at 223. Gentry Gittings, Anderson, and Yardana Horton were all present at the Mulberry Street house during the phone call and Landrum believed they could overhear the conversation because it was on speaker phone. Fifteen to twenty minutes later, someone knocked on the door of Anderson's house and "it turned out to be [Arrington and Wilson] and another guy. There was three of them, one on the sidewalk, two on the porch." Id. The front door of the house was open, but the storm door was closed. Landrum walked over to the door and "tried to open the [storm] door and then when I couldn't get the door open Emanuel Arrington pulled, had his pistol in his hand. He up'd it and shot me in the shirt" through the door. Id. at 224. After Landrum was shot in the chest, he turned around and both Anderson and Horton heard Landrum say that Arrington "just shot me." Id. at 186, 205.

[4] Around 2:30 a.m., officers of the Kokomo Police Department ("KPD") were dispatched to the scene. Three officers wore body cameras, which recorded

their actions. Officers discovered a spent .380 caliber shell casing near a ramp that leads to the porch of the home and observed the bottom half of the glass storm door had been "shot out" but the top half remained intact. *Id.* at 146. Landrum was taken to St. Vincent's Hospital in Indianapolis and ultimately survived his gunshot wound. However, the bullet remains lodged in Landrum's back and spinal cord because removing it could paralyze him. Landrum initially refused to tell officers who shot him but later, while in the hospital, identified Arrington as the shooter. *See* Tr., Vol. III at 4.

[5] On February 3, 2016, the State charged Landrum with attempted murder, a Level 1 felony, and unlawful possession of a firearm by a serious violent felon, a Level 4 felony. A jury trial was scheduled for November 13, 2018. Throughout the proceedings, Arrington had been represented by multiple private attorneys. On October 5, 2018, Arrington filed a motion to proceed pro se, in which he stated: "I . . . feel[] compe[tent] enough to represent myself[,]" "I have been researching and preparing my case since I have been incarcerated[,]" and "I am prepared and ready to go forth with my trial [set] for November 13, 2018[.]" Appellant's Appendix, Volume 8 at 102. The trial court held a status hearing on October 30 and addressed Arrington's motion:

> [Court]: OK. So you absolutely do not want to proceed with an attorney representing you, is that correct?
>
> [Arrington]: Mr. Rosselot is a paid attorney. I won't have the money to go forward.

* * *

[Court]:      OK.  And again, like I said, just because you didn't pay doesn't mean, given the timing of where we're at, I don't have to, again, I know I don't have to, the law doesn't allow me to allow him to withdraw, you understand?

[Arrington]:  Right.

[Court]:      So is it because you want to proceed and represent yourself or is it because you can't afford to pay Mr. Rosselot to represent you, moving forward?

[Arrington]:  I can't afford to pay Mr. Rosselot.

[Court]:      So you would like to have an attorney, you just can't afford one?

[Arrington]:  Right.

Tr., Vol. II at 83-84.  The trial court asked Arrington a series of questions, determined that he was indigent, and appointed David Rosselot as a special public defender.  However, Arrington again requested to proceed pro se.  The trial court and Arrington engaged in the following colloquy:

[Court]:      So, Mr. Arrington, why don't you tell the Court what it is that you want at this point in time?  Go ahead.

[Arrington]:  I would like to represent myself with standby counsel[.]

\* \* \*

[Court]:     So now you're saying that you want to proceed pro se, that's your position right now?

[Arrington]: Yes, sir.

\* \* \*

[Court]:     Alright.  Now, your trial is currently set for November 13th, 2018.  You've indicated to me that you want to represent yourself at that trial.  I want you to understand that you do have the right to represent yourself at trial, just as you have the right to have counsel represent you and to have the court-appointed counsel for trial . . . if you cannot afford an attorney.  Before you make that decision final, I want you to understand what you will be giving up.  You may have any number of defenses which apply to your case and which an attorney is trying to know.  Should you be convicted of this offense you are facing a penalty anywhere between 45 and 65 years in jail.  There are factors which the Court can consider in increasing your sentence within that range or in decreasing your sentence within that range.  These are factors which an attorney would know about.  An attorney has developed certain skills to assist you in presenting a defense to the charge against you.  These include investigating your case, interrogating witnesses against you, and finding favorable witnesses and obtaining their testimony, explaining charges in any lesser included offenses, gathering documents and other kinds of written evidence, preparing and filing motions before trial, such as motions for speedy trial, motions for discovery or motions to keep unfavorable information from being received as evidence, examining and cross-examining witnesses at trial, recognizing objectionable and unfavorable evidence and promptly objecting to its use, presenting favorable sentencing information and attacking

unfavorable sentencing information. In jury trials presenting favorable opening and closing statements, preparing appropriate written jury instructions and selecting a jury, and training, knowledge and skill at properly preserving the record of the case for purposes of appeal. An attorney can also evaluate the strengths or weaknesses of the case against you and give expert advice on whether you should attempt to seek a plea agreement with the State of Indiana, which may result in the dismissal of some, or [all] of the charges against you and a recommendation for a favorable sentence in return for your guilty plea. Do you understand each and everything that I have said to you at this point?

[Arrington]: Yes, sir.

[Court]: You must understand that if you decide not to have an attorney, you will not receive any special treatment with your defense. You will have to follow all the same rules and procedures in your case as an attorney would have to. The State will be represented by an attorney and will have the advantage that an attorney presents. If you decide to represent yourself and the result turns out badly, you need to know that you will not be able to complain that you were not an effective attorney in your own defense. Do you understand that?

[Arrington]: Yes, sir.

[Court]: OK. As I have told you, you have a right to decide against having an attorney but you must be aware that deciding not to have an attorney can turn out to be a very bad decision. Experienced lawyers almost always decide to be represented by another lawyer in a criminal case. There are some . . . things that you should consider before you appear at trial without an attorney and I want to ask you about them now. What skills or knowledge do you have that would be helpful to you if you

represent yourself? Do you have any special skills or knowledge about the law or about your case that would help you represent yourself at this time?

[Arrington]: About my case, sir.

[Court]: Alright. Do you have any special skills or knowledge about the law?

[Arrington]: No, sir.

[Court]: Have you ever studied criminal law?

[Arrington]: No, sir.

[Court]: Have you had previous experiences with the criminal justice system?

[Arrington]: Yes, sir.

[Court]: OK. Have you ever participated in a jury trial before?

[Arrington]: No, sir.

[Court]: Alright. And how much education have you had?

[Arrington]: To eleventh grade, sir.

[Court]: OK. Are you able to read and write?

[Arrington]: Yes, sir.

[Court]:     OK.  Do you believe you're a good speaker?

[Arrington]: Yes, sir.

[Court]:     Alright.  And do you believe that you can quickly become familiar with large numbers of special rules and procedures and use them the right way in a pressure situation, such as your own trial?

[Arrington]: Yes, sir.

[Court]:     Alright.  Have there been any promises or suggestions from anyone that you will receive special treatment or a milder sentence if you do not have an attorney?

[Arrington]: No, sir.

[Court]:     Alright.  Have there been any threats to you that you or another will be harmed or disadvantaged in any way if you do have an attorney?

[Arrington]: No, sir.

[Court]:     OK.  You're not under the influence of any alcohol or drugs today, are you?

[Arrington]:  No, sir.

*Id*. at 88-91.  The trial court granted Arrington's request to proceed pro se with Rosselot as standby counsel.

[6] At Arrington's jury trial, the State called Gittings as a witness. Gittings stated his name and that he was being held at a correctional facility for an unrelated matter. When the State asked Gittings whether he was at the Mulberry Street house on the night of the shooting, Gittings responded, "I don't have nothing to say. I don't have nothing to say." *Id*. at 212. Gittings repeatedly refused to answer any questions. The trial court explained, "unless there is some basis or some right you're asserting in not providing this testimony that you simply can't willfully disregard the questions that are being asked. You've been lawfully subpoenaed. You're required to be here, you're required to answer." *Id*. at 214. The trial court informed Gittings that he could be held in contempt. Gittings did not assert a right or privilege and Arrington did not request a hearing outside the presence of the jury. Instead, Gittings chose contempt, the trial court held him in contempt, and he was escorted from the courtroom in the presence of the jury.

[7] The trial continued and the jury found Arrington guilty as charged. The trial court found Arrington's criminal history and the seriousness of the crime to be aggravating circumstances and did not find any mitigating circumstances. The trial court sentenced Arrington to forty years for his attempted murder conviction and twelve years for his unlawful possession of a firearm by a serious violent felon conviction and ordered his sentences to run concurrently. Arrington now appeals. Additional facts will be supplied as necessary.

# Discussion and Decision

# I.  Waiver of Counsel

[8]  Arrington first argues that he did not knowingly, intelligently, and voluntarily waive his right to counsel.  The Sixth Amendment to the United States Constitution and Article 1, Section 13 of the Indiana Constitution guarantee a defendant the right to be represented by counsel.  *Kowalskey v. State*, 42 N.E.3d 97, 102 (Ind. Ct. App. 2015).  "The purpose of the constitutional guaranty of a right to counsel is to protect an accused from conviction resulting from his own ignorance of his legal and constitutional rights[.]"  *Johnson v. Zerbst*, 304 U.S. 458, 465 (1938).  This court has previously noted the right to counsel is "probably the most important right a defendant has because that right can affect a defendant's ability to assert all his other rights and because most defendants do not have the professional legal skills necessary to represent themselves adequately."  *Henson v. State,* 798 N.E.2d 540, 543-44 (Ind. Ct. App. 2003), *trans. denied*.

[9]  And a defendant's right to self-representation is implicit in the Sixth Amendment right to counsel.  *Faretta v. California*, 422 U.S. 806, 819-20 (1975) ("[T]he right to self-representation – to make one's own defense personally – is thus necessarily implied by the structure of the [Sixth] Amendment.  The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails.") (footnote omitted).  "[F]orcing a lawyer upon an unwilling defendant is contrary to his basic right to defend himself if he truly wants to do so."  *Id*. at 817.  When a criminal defendant waives his right to counsel and elects to proceed *pro se*, we must evaluate whether the trial court

properly determined that the defendant's waiver was knowing, voluntary, and intelligent. *Jones v. State*, 783 N.E.2d 1132, 1138 (Ind. 2003). The defendant should be made aware of the dangers and disadvantages of self-representation, *Hopper v. State*, 957 N.E.2d 613, 618 (Ind. 2011), and ultimately, the record should establish the defendant made his choice to proceed pro se with his eyes open, *Henson*, 798 N.E.2d at 544.

[10] "Waiver of assistance of counsel may be established based upon the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused." *Jones*, 783 N.E.2d at 1138. There are no "prescribed talking points" that a trial court is required to include when advising a defendant. *Poynter v. State*, 749 N.E.2d 1122, 1126 (Ind. 2001). Instead, a trial court need only determine that the defendant is making a knowing, voluntary, and intelligent waiver of counsel, acknowledging the law indulges every reasonable presumption against a waiver of this fundamental right. *Id*. To determine whether a defendant's waiver is knowing, voluntary, and intelligent, we employ a four-factor test:

> (1) the extent of the court's inquiry into the defendant's decision, (2) other evidence in the record that establishes whether the defendant understood the dangers and disadvantages of self-representation, (3) the background and experience of the defendant, and (4) the context of the defendant's decision to proceed *pro se*.

*Id*. at 1127-28; *Hopper*, 957 N.E.2d at 618. When applying these factors, we acknowledge that the trial court "is in the best position to assess whether a

defendant has knowingly and intelligently waived counsel[.]" *Poynter*, 749

N.E.2d at 1128 (quoting *United States v. Hoskins*, 243 F.3d 407, 410 (7th Cir.

2001)).  In addition,

> we will most likely uphold the trial judge's decision to honor or
> deny the defendant's request to represent himself where the judge
> has made the proper inquiries and conveyed the proper
> information, and reached a reasoned conclusion about the
> defendant's understanding of his rights and voluntariness of his
> decision.

*Id*.  This court has suggested several guidelines for advising the defendant when

he considers self-representation, which include:

> The defendant should know of the nature of the charges against
> him, the possibility that there may be lesser included offenses
> within these charges, and the possibility of defenses and
> mitigating circumstances surrounding the charges.  The
> defendant should be aware that self-representation is almost
> always unwise, that the defendant may conduct a defense which
> is to his own detriment, that the defendant will receive no special
> indulgence from the court and will have to abide by the same
> standards as an attorney as to the law and procedure, and that
> the State will be represented by experienced professional legal
> counsel.

*Dowell v. State*, 557 N.E.2d 1063, 1066-67 (Ind. Ct. App. 1990), *cert. denied*, 502

U.S. 861 (1991); *see also Jones*, 783 N.E.2d at 1138.  However, these guidelines

"do not constitute a rigid mandate setting forth specific inquiries that a trial

court is required to make before determining whether a defendant's waiver of

right to counsel is knowing, intelligent, and voluntary." *Jones*, 783 N.E.2d at 1138 (internal quotation omitted).

[11] The first two *Poynter* factors focus on whether the defendant had sufficient information about the dangers and disadvantages of self-representation, one through the trial court's inquiry, and the other through any other evidence in the record. *Drake v. State*, 895 N.E.2d 389, 393 (Ind. Ct. App. 2008). Arrington concedes that the trial court reviewed "many advantages [that] being represented by an experienced attorney could bring" but takes issue with the trial court's alleged use of a "bench book" advisement. Amended Brief of Appellant at 17. He maintains that the trial court failed to engage in a meaningful colloquy and did not dive "into the many pitfalls that a layperson would expect to experience in representing himself, especially in a complicated and serious criminal matter[.]" *Id*. We disagree.

[12] At the status hearing, the trial court emphasized that, before Arrington made the decision to proceed pro se, it "want[ed Arrington] to understand what [he] will be giving up." Tr., Vol. II at 89. The trial court informed Arrington of the following: that an attorney would be aware of any applicable defenses; an attorney would be aware of the factors the trial court would consider in imposing his sentence; and an attorney has skills to assist in defending his case, including investigating the case, interrogating witnesses, finding favorable witnesses, obtaining documents and written evidence, explaining lesser included offenses, preparing and filing motions before trial such as for speedy trial or discovery, examining and cross-examining witnesses, recognizing and

objecting to certain evidence, preparing jury instructions, preserving the record for appeal, evaluating the strengths and weaknesses of the case, and determining whether a plea agreement is wise. The trial court advised Arrington that, if convicted, he faces forty-five to sixty-five years of imprisonment, he would not receive special treatment if he proceeded pro se, he must follow the same rules and procedures as an attorney is required to do, he could not later claim ineffective assistance of counsel, and the State would have the advantage of being represented by an attorney. The trial court also informed Arrington that "deciding not to have an attorney can turn out to be a very bad decision . . . [and e]xperienced lawyers almost always decide to be represented by another lawyer in a criminal case." *Id*. at 90. Because the trial court thoroughly explained the dangers and disadvantages of self-representation, this factor weighs in favor of a knowing, intelligent, and voluntary waiver of counsel.

[13] The record also reveals that Arrington was "no stranger to the criminal justice system" and confirms that he is an experienced criminal litigant. *See Taylor v. State*, 944 N.E.2d 84, 90-91 (Ind. Ct. App. 2011). The trial court confirmed with Arrington that he has had "previous experiences" with the criminal justice system, which, according to Arrington's presentence investigation report, includes sixteen felony convictions and ten misdemeanor convictions. Tr., Vol. II at 90-91; Appellant's App., Vol. 8 at 121. The evidence in the record demonstrates that Arrington had the requisite background and experience to make a knowing, voluntary, and intelligent waiver of counsel. Therefore, this

factor weighs in favor of a knowing, voluntary, and intelligent waiver of counsel.

[14] The third factor concerns whether the defendant has the background and experience necessary to make a voluntary, knowing, and intelligent waiver of his or her right to counsel. *Drake*, 895 N.E.2d at 394. After the trial court explained the many dangers of self-representation, it engaged in a colloquy with Arrington regarding his background. The trial court asked Arrington whether he had ever studied criminal law, had any special skills or knowledge about the law, had ever participated in a jury trial, and had the ability to read and write. The trial court also asked about the extent of his education. Although Arrington confirmed that he did not have any special skills or knowledge about the law or a jury trial, he did confirm that he had an eleventh grade education, can read and write, believed he was a good speaker, and that he believed he would be able to quickly become familiar with the large number of special rules and procedures applicable to a jury trial. The trial court also confirmed that Arrington was not under the influence of any substance and had not been promised special treatment or a lesser sentence to proceed pro se.

[15] Finally, we evaluate the context of Arrington's decision to represent himself. If a defendant's decision to proceed without counsel appears tactical, then this factor weighs in favor of finding a knowing and intelligent waiver. *Drake*, 895 N.E.2d at 395. Arrington argues that the context in which he elected to represent himself reveals that he proceeded pro se solely to avoid further delays in his trial as he had been incarcerated since his arrest on February 11, 2016.

He maintains that the record demonstrates that he clearly wanted an attorney; however, the record reveals otherwise.

[16] Arrington's lead attorney, Fred Grady, filed a motion to withdraw due to medical issues on July 30, 2018, one week prior to a scheduled trial date. In his motion, Grady stated that over a year before, Rosselot had entered his appearance as "local counsel" on behalf of Arrington and had been assisting Grady. Appellant's App., Vol. 8 at 84. The trial granted Grady's motion and the trial was continued. On October 5, 2018, Arrington filed a motion to proceed pro se, in which he stated: "I . . . feel[] compe[tent] enough to represent myself[,]" "I have been researching and preparing my case since I have been incarcerated[,]" and "I am prepared and ready to go forth with my trial[.]" *Id.* at 102. On October 20, 2018, Rosselot filed a motion to withdraw his appearance as Arrington wished to represent himself. The same day, the trial court held a status hearing and engaged in a colloquy with Arrington regarding his decision to proceed pro se. Arrington initially stated he could no longer afford Rosselot and the trial court found Arrington indigent and offered to appoint a public defender to represent him. Ultimately, the trial court appointed Rosselot as Arrington's stand by public defender.

[17] The evidence in the record supports a strategic decision by Arrington to proceed pro se, rather than to avoid further delay. Arrington stated that he had been researching his case, felt prepared for trial, and declined the appointment of Rosselot as counsel. Instead, Arrington wanted to represent himself with Rosselot as standby counsel. The context of Arrington's decision to proceed

pro se weighs in favor of a knowing, voluntary, and intelligent waiver of counsel.

[18] Arrington is an experienced criminal litigant, had stand by counsel throughout his trial, and had been sufficiently warned of the dangers and disadvantages of representing himself. Based on all four factors, Arrington's decision to waive counsel and proceed pro se was knowing, voluntary, and intelligent.

## II. Fundamental Error

[19] Arrington next claims the trial court committed fundamental error by failing to remove the jury after Gittings refused to testify and by failing to conduct a hearing on Gittings' refusal outside the presence of the jury. Arrington concedes that he did not object to the trial court's procedure and therefore must demonstrate fundamental error.

[20] A claim that has been forfeited by a defendant's failure to raise a contemporaneous objection can nonetheless be reviewed on appeal if fundamental error has occurred. *Brown v. State*, 929 N.E.2d 204, 207 (Ind. 2010). Fundamental error allows this court to "address an error that made a fair trial impossible or constituted a clearly blatant violation of basic and elementary principles of due process presenting an undeniable and substantial potential for harm[.]" *Brewington v. State*, 7 N.E.3d 946, 974 (Ind. 2014) (internal quotations and alterations omitted), *cert. denied*, 135 S.Ct. 970 (2015). The fundamental error exception is "extremely narrow," *Matthews v. State*, 849 N.E.2d 578, 587 (Ind. 2006), and a "daunting standard[,]" applicable only in

egregious circumstances, *Knapp v. State*, 9 N.E.3d 1274, 1281 (Ind. 2014), *cert. denied*, 135 S.Ct. 978 (2015).

[21] Indiana Code section 35-37-3-1 provides the proper procedure when a witness refuses to testify:

> (a) If a witness, in any hearing or trial occurring after an indictment or information has been filed, refuses to answer any question . . . , the court shall remove the jury, if one is present, and immediately conduct a hearing on the witness's refusal. After such a hearing, the court shall decide whether the witness is required to answer the question[.]

> (b) If the prosecuting attorney has reason to believe that a witness will refuse to answer a question . . . during any criminal trial, the prosecuting attorney may submit the question or request to the trial court. The court shall hold a hearing to determine if the witness may refuse to answer the question[.]

Although we recognize that the trial court did not remove the jury and immediately conduct a hearing on Gittings' refusal to testify as required by the statute, Arrington fails to demonstrate that this deprived him of the opportunity for a fair trial.

[22] The State claims the statute contemplates that the jury would hear a witness' refusal to testify at least once and therefore, a witness' continued refusal to testify, in the presence of the jury, does not rise to the level of fundamental error. Arrington asserts that "[i]t appears likely that the State knew Gittings would refuse to testify" based on the following statement Gittings' made: "I tried to contact, I mean as you know, I've been trying to contact and have my

people contact me and I still got forced to come here so I don't have nothing to say." Amended Br. of Appellant at 20 (citing Tr., Vol. II at 212). Arrington maintains that, because of Gittings' refusal to testify, the jury could infer that Gittings was "somehow unduly influenced by Arrington into not cooperating. The State made a conscious and flagrant attempt to build its case on this inference." Amended Br. of Appellant at 20-21. As the State notes, there are numerous explanations as to why Gittings may have decided not to testify and we are not at liberty to speculate. Ultimately, we are unpersuaded that this sole statement presents evidence that the State knew before trial that Gittings would refuse to testify and then made the conscious decision to demonstrate that Arrington convinced or unduly influenced Gittings into not testifying.

[23] In *State v. Eubanks*, a panel of this court held that the witnesses' invocations of the Fifth Amendment did not prejudice the defendant or deprive him of a fair trial. 729 N.E.2d 201, 206-07 (Ind. Ct. App. 2000). There, the trial court had concluded that the witnesses' invocations of their Fifth Amendment privilege was fundamental error. *Id*. at 206. In post-conviction proceedings, the defendant argued that the State called the witnesses to the stand *knowing* they would invoke the privilege, which constituted fundamental error as he failed to object at trial. *Id*. This court looked to the United States Supreme Court's decision in *Namet v. United States*, 373 U.S. 179 (1963), in which it indicated that to determine whether prejudicial error occurred, courts should look to the particular circumstances of each case. *Id*. at 207. In doing so, courts should focus on two factors: (1) error may result from prosecutorial misconduct when

the government makes a "conscious and flagrant" attempt to build its case out of inferences arising from a witness's invocation of the privilege; and (2) prejudicial error may occur when the inferences from a witness's refusal to testify add "critical weight to the prosecution's case." *Id*. (quoting *Namet*, 373 U.S. at 186-87). Although this court disproved of the prosecution's tactics in calling witnesses they knew would invoke the Fifth Amendment, it determined there was no evidence that the State attempted to build its case out of the inferences, that the State relied on their assertions of privilege to establish the elements of the offenses, or that the testimony added critical weight to the State's case. *Id*. at 207-08. We held that the defendant was not deprived of a fair trial because any adverse inference that could be drawn from the witnesses' invocations was merely cumulative, the State's questioning was of a limited nature, and there were a substantial number of witnesses presented. *Id*. at 208. And thus, no fundamental error occurred.

[24] Such is the case here. Even if the State knew Gittings would refuse to testify, as Arrington maintains, there is no evidence in the record that the State made a "conscious and flagrant" attempt to build its case out of the adverse inferences arising from Gittings refusal to testify, that the State relied on Gittings' refusal to establish the elements of the offenses, or that the inferences added critical weight to its case. Unlike the witnesses in *Eubanks*, Gittings did not invoke his Fifth Amendment privilege, which would have been arguably more prejudicial than his refusal to testify. Given the numerous witnesses who testified at trial and the evidence admitted, including the officers' body camera footage, we

cannot conclude that Arrington was deprived of a fair. He has failed to prove that the trial court's failure to remove the jury and conduct a hearing on Gittings' refusal to testify was a "blatant violation of [his] basic and elementary principles of due process presenting an undeniable and substantial potential for harm[.]" *Brewington*, 7 N.E.3d at 974. Accordingly, no fundamental error occurred.

## III. Sufficiency of the Evidence

[25] Our standard of reviewing a sufficiency claim is well-settled. *Brent v. State*, 957 N.E.2d 648, 649 (Ind. Ct. App. 2011), *trans. denied*. In reviewing the sufficiency of the evidence required to support a criminal conviction, we do not reweigh the evidence or judge the credibility of the witnesses. *Bailey v. State*, 907 N.E.2d 1003, 1005 (Ind. 2009). Instead, we consider only the evidence most favorable to the verdict and the reasonable inferences supporting it. *Id*. Therefore, it is not necessary that the evidence overcome every reasonable hypothesis of innocence. *Gray v. State*, 957 N.E.2d 171, 174 (Ind. 2011). "[W]e will affirm the conviction unless no reasonable trier of fact could have found the elements of the crime beyond a reasonable doubt." *Id*.

[26] The State must prove all elements of the charged crime beyond a reasonable doubt. *Taylor v. State*, 587 N.E.2d 1293, 1301 (Ind. 1992); Ind. Code § 35-41-4-1(a) ("A person may be convicted of an offense only if his guilt is proved beyond a reasonable doubt."). A person who "knowingly or intentionally kills another human being" commits murder, a felony. Ind. Code § 35-42-1-1(1).

Indiana's attempt statute provides: "A person attempts to commit a crime when, acting with the culpability required for commission of the crime, the person engages in conduct that constitutes a substantial step toward commission of the crime. . . . [A]n attempt to commit murder is a Level 1 felony." Ind. Code § 35-41-5-1(a).

[27] The only element Arrington challenges is his identity as the shooter. He argues that the State failed to produce sufficient evidence identifying him as the alleged shooter and therefore, his convictions should be reversed. The State produced the following testimony and circumstantial evidence to prove Arrington was the shooter:

- Wilson and Landrum got into an altercation at Big Daddy's and Arrington jumped in and hit Landrum in the back of the head. Tr., Vol. II at 220.

- Following the altercation, Landrum called Wilson and told him if Arrington "wanted to fight me he could fight me one on one." *Id.* at 222. Arrington was with Wilson at the time and Landrum could hear Arrington calling him names in the background. Landrum subsequently told them he was "over on Mulberry." *Id.* at 223.

- Landrum testified that when he heard a knock on the door, he walked to the door, witnessed Arrington at the door holding a pistol in his hand, and then shot him in the chest. *Id.* at 224.

- Anderson and Horton both testified that, after Landrum was shot, he turned around and stated,"[Arrington] just shot me." *Id*. at 186, 205.

- Following the shooting, Detective James Nielson presented a photo array of six individuals to Anderson and she identified Arrington as the shooter. She wrote her initials and date next to the photo she identified as Arrington. *See id*. at 200-01; Exhibits Volume at 10-11.

- KPD Officers Brent Wines and Ryan Shuey testified that, at the scene, Anderson stated that Arrington shot Landrum. Tr., Vol. II at 133-34, 170-72. Officer Wines also testified that Anderson stated that she witnessed Arrington with a gun on the porch of her home but did not see Arrington fire the weapon. *Id*. at 149.

- On or around February 4, 2016, KPD Officer Purtee visited Landrum in the hospital to take his statement during which time Landrum stated that Arrington shot him. Tr., Vol. III at 4. Officer Purtee also showed Landrum a photo array and asked him to identify who shot him. Landrum positively identified Arrington as the shooter.

- Expert Glenn Bard analyzed and mapped the cell phone records for Wilson and Arrington between 2:27 and 2:32 a.m. on February 2, 2016, placing them in the area of the scene of the crime. *Id*. at 18; Exhibit Vol. at 83-93.

Arrington argues that because Landrum had consumed alcohol the night of the shooting, he is an unreliable witness and his testimony is "so unbelievable and incredible" that it falls under the incredible dubiosity rule. Amended Br. of Appellant at 22.

> The incredible dubiosity rule allows this court to impinge upon a fact finder's responsibility to judge the credibility of the witnesses only when confronted with "inherently improbable" testimony. The rule is applied in limited circumstances, namely where there is 1) a sole testifying witness; 2) testimony that is inherently contradictory, equivocal, or the result of coercion; *and* 3) a complete absence of circumstantial evidence. Application of the incredible dubiosity rule is rare and the standard to be applied is whether the testimony is so incredibly dubious or inherently improbable that no reasonable person could believe it.

*Morris v. State*, 114 N.E.3d 531, 536 (Ind. Ct. App. 2018) (emphasis added) (internal citations omitted), *trans. denied*. The second prong is satisfied only when the witness's trial testimony is inconsistent within itself, not when it is inconsistent with other evidence or prior testimony. *Smith v. State*, 34 N.E.3d 1211, 1221 (Ind. 2015). Accordingly, this rule is inapplicable to the present case because, as demonstrated above, the State presented witnesses who corroborated Landrum's testimony and his testimony was not inconsistent within itself.

In sum, the State presented sufficient evidence from which the trier of fact could have found the elements of the crimes, including Arrington's identity as the shooter, beyond a reasonable doubt. Arrington argues that it was factually

impossible for him to have shot Landrum given Landrum's height and the fact that only the bottom portion of the storm door, not the top half, was shattered. Arrington's argument constitutes a request for this court to reweigh the evidence, which we cannot do. *See Bailey*, 907 N.E.2d at 1005. We conclude there was sufficient evidence to support Arrington's convictions.

# IV. Sentencing

[30] Finally, Arrington asserts that the trial court erred by issuing an inadequate sentencing statement, finding an improper aggravating factor, and failing to find one mitigating factor. We disagree.

[31] Sentencing decisions rest within the sound discretion of the trial court. *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218. Thus, we review only for an abuse of discretion, which occurs if the trial court's decision is "clearly against the logic and effect of the facts and circumstances before [it], or the reasonable, probable, and actual deductions to be drawn therefrom." *Id*. A trial court may abuse its discretion by: (1) failing to enter a sentencing statement; (2) entering a sentencing statement that explains reasons for imposing the sentence that are unsupported by the record; (3) omitting reasons clearly supported by the record and advanced for consideration; or (4) finding factors that are improper as a matter of law. *Kimbrough v. State*, 979 N.E.2d 625, 628 (Ind. 2012). The identification or omission of reasons provided for imposing a sentence are reviewable on appeal for an abuse of discretion, but the weight given to those reasons is not subject to

appellate review. *Weedman v. State*, 21 N.E.3d 873, 893 (Ind. Ct. App. 2014), *trans. denied*.

[32] Here, the trial court found Arrington's criminal history and the seriousness of the crime as aggravating circumstances and did not find any mitigating circumstances. Arrington argues that the "seriousness of the crime" is an improper aggravating circumstance absent "some detailed explanation as to how it was more significant than the crime itself." Amended Appellant's Br. at 25. "[A] material element of a crime may not also constitute an aggravating circumstance to support an enhanced sentence, but the particularized individual circumstances may be considered as a separate aggravating factor." *Williams v. State*, 619 N.E.2d 569, 573 (Ind. 1993). Although the trial court did not expand on this particular aggravating factor, a reasonable interpretation, based on the evidence in the record, is that the trial court viewed the nature of the crime and injury to the victim, rather than the elements of the crime itself, as very serious. The record reveals that the bullet entered Landrum's chest three inches from his heart and remains lodged in his back and spinal cord because removal of the bullet could paralyze him. The trial court did not abuse its discretion with respect to this aggravating factor. Even so, Arrington does not challenge the trial court's finding that his criminal history, which is comprised of sixteen felonies and ten misdemeanors, was an aggravating circumstance. And a single valid aggravating circumstance is adequate to justify an enhanced sentence. *Hawkins v. State*, 748 N.E.2d 362, 363 (Ind. 2001). Accordingly, we find no error.

[33] Arrington also maintains that the trial court failed to identify the undue hardship of his incarceration on his four children as a mitigating circumstance. First, as the State points out, Arrington did not proffer this as a mitigating circumstance to the trial court at the sentencing hearing. *See* Tr., Vol. III at 196-98. Therefore, Arrington has waived any alleged error with respect to this issue. *Banks v. State*, 841 N.E.2d 654, 659 (Ind. Ct. App. 2006) (defendant waived claims of error regarding the trial court's failure to identify mitigating circumstances because the defendant failed to raise them to the trial court at the sentencing hearing), *trans. denied*; *see also Bryant v. State*, 802 N.E.2d 486, 501 (Ind. Ct. App. 2004) (failure to present claim that the defendant's drug abuse history should have been a mitigating circumstance rather than an aggravating circumstance at the sentencing hearing resulted in waiver on appeal), *trans. denied*.

[34] Waiver notwithstanding, Arrington's argument fails. We begin by noting that the determination of mitigating circumstances is within the trial court's discretion. *Healey v. State*, 969 N.E.2d 607, 616 (Ind. Ct. App. 2012), *trans. denied*. A trial court is not obligated to accept a defendant's claim as to what constitutes a mitigating circumstance, *Weedman*, 21 N.E.3d at 893, nor is it required to weigh a mitigating factor as heavily as the defendant requests, *Field v. State*, 843 N.E.2d 1008, 1010 (Ind. Ct. App. 2006), *trans. denied*. "An allegation that the trial court failed to identify or find a mitigating factor requires the defendant to establish that the mitigating evidence is both significant and clearly supported by the record." *Anglemyer*, 868 N.E.2d at 493.

Indeed, we recognize many families of incarcerated individuals suffer hardship as a result of their incarceration. As this court has explained, "[m]any people convicted of serious crimes have one or more children, and absent special circumstances, trial courts are not required to find that imprisonment will result in an undue hardship." *Ware v. State*, 816 N.E.2d 1167, 1178 (Ind. Ct. App. 2004). Arrington has failed to demonstrate that the undue hardship on his children involves special circumstances. *Cf. Anglin v. State*, 787 N.E.2d 1012, 1018 (Ind. Ct. App. 2003) (no abuse of discretion in failing to consider the impact of the defendant's incarceration on his child as a mitigating circumstance where the mother had care and custody of their ill child and there was no evidence that the child's needs would not be met during defendant's incarceration), *trans. denied*.

In sum, the trial court properly identified aggravating circumstances and there is no evidence in the record revealing special circumstances with respect to the undue hardship on Arrington's children as a result of his incarceration. Accordingly, the trial court did not abuse its discretion in sentencing Arrington.

# Conclusion

For the reasons set forth above, we conclude Arrington knowingly, intelligently, and voluntarily waived his right to counsel and the State present sufficient evidence to support Arrington's convictions for attempted murder and unlawful possession of a firearm by a serious violent felon. We also conclude that the trial court did not commit fundamental error when it did not remove the jury

from the courtroom following a State's witness' refusal to testify. Finally, the trial court did not abuse its discretion in sentencing Arrington. Accordingly, the judgment of the trial court is affirmed.

[38]     Affirmed.

Mathias, J., and Pyle, J., concur.